John A. PETERS, Respondent,

v.

The MUTUAL BENEFIT LIFE INSURANCE COMPANY, Appellant.

No. C6–87–1564.

Court of Appeals of Minnesota.

March 8, 1988.

Steve G. Heikens, Minneapolis, for respondent.

Steven R. Anderson, Bruce Jones, Faegre & Benson, Minneapolis, for appellant.

Heard, considered, and decided by RANDALL, P.J., and LANSING and MULALLY *, JJ.

## OPINION

LANSING, Judge.

John Peters brought this action for breach of contract, misrepresentation, and unjust enrichment following the termination of his position as general agent for appellant Mutual Benefit Life Insurance Company. Peters dismissed the unjust en-

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

richment claim before trial, and the trial court dismissed the misrepresentation claim at the close of plaintiff's case. The jury returned a verdict in Peters' favor on the breach of contract claim, and Mutual Benefit appeals the trial court's denial of its motion for judgment notwithstanding the verdict or a new trial. We affirm.

## FACTS

In June 1977 John Peters and Mutual Benefit executed a written general agency contract by which Peters was given the exclusive right to sell Mutual Benefit insurance in the Minneapolis region in exchange for devoting his entire energies to Mutual Benefit's business. The contract allowed Mutual Benefit to terminate the agency without cause on two months' notice.

As general agent, Peters was not a Mutual Benefit employee; he ran his own office and hired agents in return for "overrides" based on the commissions generated by the office. Mutual Benefit maintained a separate group insurance office in the Minneapolis area, staffed by Mutual Benefit employees, from which Peters also received overrides on group premiums.

In 1976, Mutual Benefit began developing a "Going Concern Value" program under which new general agents would pay outgoing general agents a sum of money for the going concern value or "goodwill" of the agency. The purpose of the program was to encourage general agents who were approaching retirement age to continue to invest their resources in promoting the business and training new agents.

At a 1977 general agents' annual meeting, which Peters attended, Mutual Benefit vice president John Mascotte presented the program and distributed a handout outlining it, although he stated that it would not be finalized until it was approved by the State of New York. The handout described the program as based on the premise that an incoming agent would be willing to pay for obtaining an ongoing agency and that the program's developers believed that an incoming general agent would be inclined to pay an amount equal to the present value of at least three years of overrides for the privilege of acquiring the manpower represented by dollars of commission base in excess of $100,000.

The handout also set forth a specific formula by which "Going Concern Value" (GCV) would be calculated.

At another general agents' meeting in March 1978, Mascotte announced that New York had approved the program and it was now official company policy that "no one can become a general agent in this company unless he or she agrees to pay at least as much money as this formula throws off in order to become a general agent." Peters testified that he understood this announcement to mean that the GCV formula merely established a minimum price and that a new general agent would not be appointed unless he and the incoming agent agreed on a price. He also understood that he could refuse to transfer the agency to someone who would pay only the minimum established by formula. Although Peters testified that he did not change the way he ran his agency in reliance on the program, he continued to reinvest his profits into the agency.

By March 1979, the final details of the program had been worked out and the general agents' contracts were formally amended to incorporate the program. There was evidence, however, that going concern value had been paid on agency transfers before that date.

In May 1978 Mutual Benefit officials told Peters that his agency was being terminated. When Peters pointed out that the contract required 60 days' notice, the termination date was extended to August 1978. However, because Mutual Benefit refused to pay operating allowances, Peters agreed in July to a resignation backdated to June 15, 1978.

A Mutual Benefit vice president, James Peterson, succeeded Peters as general agent. Although he testified that he was willing to pay Peters the GCV as deter-

mined by formula, he did not make a specific offer until January 1979, when he offered approximately $12,000—Mutual Benefit's calculation of GCV. In an earlier calculation, Mutual Benefit had estimated GCV at $38,588. Its final calculation of the GCV formula in March 1979 was $35,859.

Peters' complaint alleged that Mutual Benefit breached its agreement to "pay or cause to be paid * * * a sum in cash *equal to* the 'Going Concern Value'" which was "to be determined in accordance with a formula set out in the contract" (emphasis added). Peters' misrepresentation claim was similarly based on a plan that would pay a general agent cash *equal to* the GCV at the time of termination. The misrepresentation claim further alleged damages of $404,500 for Mutual Benefit's failure to compensate Peters for the going concern value.

Although Peters did not amend his complaint, by trial he had revised his position on the terms of the compensation plan. Peters' pretrial memorandum characterized the contract as providing that

> Mutual would help find a buyer and allow Peters to negotiate a sum using the going concern value as a minimum. Damages in this breach of contract case are the amount Plaintiff would have received in a sale of the general agency to a third party, using the going concern value as a minimum and with Mutual's guarantee that no new general agent would be allowed to start without an agreement with Peters on its purchase price.

(Emphasis in original).

In response, Mutual Benefit made a motion in limine to prevent Peters from producing "any evidence as to any method of calculating the 'Going Concern Value' of plaintiff's general agency other than the formula established by defendant." Mutual Benefit did not attempt to limit evidence on the terms of the alleged contract. At the hearing on this motion, Peters' attorney acknowledged the constraint of the pleadings, but argued that other evidence

of value was relevant to the misrepresentation claim and also to show how value should have been calculated under the formula in the breach of contract claim. The trial court denied the motion in limine without stating its reasons.

At the close of Peters' case, Mutual Benefit moved for a directed verdict on all remaining counts, and the trial court granted the motion on the misrepresentation claim, again without stating its reasons. The jury returned a $365,000 verdict for Peters on the breach of contract count, and Mutual Benefit moved for judgment notwithstanding the verdict or a new trial. Appeal is from denial of that motion.

## ISSUES

1. Was the evidence sufficient to support a finding of modification of Peters' agency contract to incorporate the GCV program?

2. Is a new trial required because of erroneous instructions on contract formation?

3. Does the statute of frauds bar modification of the contract?

4. Was the jury properly instructed on the issue of damages?

5. Was the damage award excessive and unsupported by the evidence?

6. Did the trial court's evidentiary rulings constitute an abuse of discretion?

## ANALYSIS

### I

In its special verdict, the jury found that Peters and Mutual Benefit had formed a contract which would allow Peters to receive payment of money upon the termination of his general agency. Mutual Benefit argues that this finding is unsupported by any evidence of offer, acceptance and consideration.

Generally speaking, a promise is an offer if it is made with the intent to

reach a binding agreement. *See Cederst-rand v. Lutheran Brotherhood,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962); 1 *Corbin on Contracts* § 11 (1963). The intention of a party to make an offer is to be determined by outward manifestations, and the existence of an offer may thus be inferred from words and conduct. *Cederstrand,* 263 Minn. at 532, 117 N.W.2d at 221. General statements of policy which do not exhibit an intent to be bound are not offers. *See Degen v. Investors Diversified Services, Inc.,* 260 Minn. 424, 110 N.W.2d 863 (1961).

■ Viewed in conjunction with the 1977 preliminary description of the program, the spring 1978 announcement that the GCV program was official company policy and that no one could become a general agent without paying at least formula GCV to the outgoing agent is sufficiently definite in form and evidences sufficient intent to be bound to support the jury's finding that an offer had been made.

■ Once made, an offer may be accepted by performance of the actions contemplated by the offer, thus resulting in the creation of a unilateral contract. *See 1 Corbin on Contracts* § 70 (1963). However, for performance to constitute an acceptance, it must differ from what the promisee is already contractually obligated to do. *Hartung v. Billmeier,* 243 Minn. 148, 153, 66 N.W.2d 784, 789 (1954).

■ Peters' continued activities as general agent constitute an acceptance of Mutual Benefit's offer to modify the contract by implementing the GCV program. While Peters was obligated by contract to devote his full time and energies to the agency, he was not contractually obligated to stay as general agent for any specified time. Nor did the written contract require Peters to reinvest his profits toward the expansion of the agency, yet Peters did reinvest a substantial portion of his overrides after the program was announced.

■ It appears that this reinvestment was precisely what Mutual Benefit was "bargaining for" in developing the program. According to Mascotte, the purpose of the program was to "make it appropriate for the general agent to continue to spend money and invest in the expansion of the agency right up to the normal retirement date." The GCV program, once adopted as official policy, constituted an offer capable of acceptance by performance of the actions which the program was intended to encourage.

■ In addition to constituting an acceptance of the offer, Peters' continued performance and reinvestment of agency profits constitute consideration for the contract modification. Under *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983), consideration supporting a unilateral contract can be supplied when an at-will employee stays on the job although free to leave. Even if additional consideration were required, that consideration was provided by Peters' reinvestment of his profits into the agency. Reinvestment was not contractually required, was beneficial to Mutual Benefit and detrimental to Peters, and was what the program was intended to encourage.

■ The existence of a contract, as well as its terms, are issues for the factfinder. *Eklund v. Vincent Brass & Aluminum Co.,* 351 N.W.2d 371, 376 (Minn.Ct. App.1984), *pet. for rev. denied* (Minn. Nov. 1, 1984) (citing *Bergstedt, Wahlberg, Berquist Associates, Inc. v. Rothchild,* 302 Minn. 476, 480, 225 N.W.2d 261, 263 (1975)). The jury's resolution of those issues will not be overturned if, on the record, it could reasonably have made such findings. *Cardinal Consulting Co. v. Circo Resorts, Inc.,* 297 N.W.2d 260, 265 (Minn.1980). In this case there was sufficient evidence of offer, acceptance and consideration to support the jury's finding that a contract existed.

## II

Mutual Benefit argues that omissions in the trial court's jury instructions require a

new trial. Specifically, Mutual Benefit asserts that the court should have instructed the jury that in order for there to be a contract, the parties must agree "at the same time" and that "there must also be consideration to support the contract." *See* 4 Minnesota Practice, CIV. JIG III 620 (1986).

On the first point, the trial court correctly instructed the jury that "the parties must agree with reasonable certainty about the same thing and on the same terms." Although time may be at issue when there is evidence of a pre-acceptance revocation of the offer, a "simultaneous meeting of the minds" is not otherwise required. *See* 1 *Corbin on Contracts* § 39, at 166 (1963) ("It is clear today that the consummation of a contract does not require two actually consenting minds at one moment of time; it is equally unnecessary that there should be simultaneous expressions of consent.").

In this case there is no evidence that the offer was revoked. Although a change in the terms of an offer may be tantamount to revocation, an offer for a unilateral contract may neither be changed nor revoked once the offeree begins the performance requested by the offer. *Sylvestre v. State*, 298 Minn. 142, 157, 214 N.W.2d 658, 667 (1973). Finally, the jury was instructed that the parties must agree "on the same terms," thus obviating Mutual Benefit's concern about the effect of changes in the program over time.

On the other hand, the trial court should have instructed the jury that there must be consideration to support the contract. *Pine River* does not eliminate the necessity for consideration to support a unilateral contract modification; it address-

es whether consideration in addition to merely staying on the job is required.

However, under the facts of this case the omission does not require a new trial. Evidence that Peters remained as general agent and reinvested his profits into the agency establishes consideration. Both parties discussed the necessity of consideration in their final arguments, and the trial court did instruct the jury on the definition of consideration. *See* 4 Minnesota Practice, CIV. JIG III 626 (1986). The omission did not destroy the correctness of the charge as a whole, cause a miscarriage of justice, or result in substantial prejudice. *See Lindstrom v. Yellow Taxi Co. of Minneapolis*, 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974).

### III

Mutual Benefit argues that even if the agency contract had been modified as Peters alleges, that modification would be unenforceable under the statute of frauds, Minn.Stat. § 513.01(1) (1986). The essence of this argument is that because the GCV program provided for payments to be made over a period of at least ten years after retirement, the contract was not capable of performance within one year and a writing was therefore required.

Although the GCV program required payments over ten years, there was no evidence that Mutual Benefit would make those payments. It promised that it would not appoint a new general agent unless the new agent promised to make the payments.[1] Because a new general agent could have been appointed within one year of the modification, Mutual Benefit's promise was capable of performance within one year and is not rendered unenforceable by the statute of frauds.

---

1. Mutual Benefit argues that the jury found a contract requiring payment to Peters *by* Mutual Benefit. However, the special verdict asked only if the parties had formed a contract "that provided that John Peters would receive payment of money upon termination of the contract" and did not specify from whom that pay-

ment would be received. The trial court did not adopt Mutual Benefit's proposed special verdict form, which asked whether there was a contract "that required Mutual Benefit to pay to John Peters" the "Going Concern Value" of the agency. Mutual Benefit did not object to that aspect of the special verdict submitted to the jury.

## IV

Mutual Benefit argues that the trial court "erroneously allowed the jury to range beyond the scope of the complaint in determining damages." The relevant portions of the complaint alleged that Mutual Benefit agreed that if Peters were terminated, it would pay or cause to be paid to him a sum *equal to* the GCV as determined in accordance with the formula. Mutual Benefit argues that damages should therefore have been limited to those computed using the formula.

■ Generally, a trial court must base its relief on issues either raised by the pleadings or litigated by consent. *Folk v. Home Mutual Insurance Co.*, 336 N.W.2d 265, 267 (Minn.1983). Mutual Benefit's motion in limine requested restriction of evidence on the computation of damages, but it failed to object to evidence that the contract terms set GCV as a minimum. To the contrary, on cross-examination counsel for Mutual Benefit repeatedly questioned Peters about his understanding of the terms of the GCV program. In final argument, counsel for Mutual Benefit asserted its version of the terms of the contract, emphasizing evidence contradicting Peters' theory that formula GCV was merely a minimum.

Mutual Benefit suggests that it understood this evidence to have been admitted in support of the misrepresentation claim. While counsel for Peters did state at the pretrial hearing that other valuation evidence would be relevant to the misrepresentation claim, the trial court's denial of the motion in limine did not restrict the valuation evidence to that issue. However, like the breach of contract claim, the misrepresentation claim alleged only that Mutual Benefit represented it would pay or cause to be paid an amount *equal to* GCV. Evidence of other representations concerning GCV would thus vary from the terms

of the misrepresentation count as well. Finally, Mutual Benefit argued the terms of the contract in final argument, which indicates that the evidence was not admitted on the issue of misrepresentation because that claim had been dismissed.

■ It would not make sense to restrict the jury verdict to GCV formula damages if the verdict is based on Peters' version of the terms, that formula GCV was only a starting point for negotiations. Even though Mutual Benefit did not consent to the introduction of other valuation evidence, the issue of the terms of the alleged contract was squarely contested and voluntarily litigated and supports the submission of damages to the jury without the requested restriction.[2]

■ As both parties point out, the appropriate measure of damages for breach of contract is that amount which will place the plaintiff in the same situation as if the contract had been performed. *Christenson v. Milde*, 402 N.W.2d 610, 613 (Minn.Ct.App.1987). The jury in this case was told to award Peters a sum which would adequately compensate him for his "loss." This instruction and the verdict question were not prejudicial in the circumstances of this case: the instruction required determination of the loss caused by the breach, and the only basis for estimating loss caused by the breach would be what Peters could have received had the contract been performed. No evidence of other consequential damages appears in the record.

## V

■ Mutual Benefit argues that the damages awarded—$365,000—are excessive, unsupported by the evidence, and the result of passion or prejudice. Mutual Benefit initially asserts that no possible

---

2. Despite Mutual Benefit's pretrial assertion that the misrepresentation count failed to state a claim, it did not move for dismissal of that claim until after the close of Peters' case. This, in addition to not objecting to evidence on different contract terms, added to the confusion surrounding the litigation. Under *Folk*, 336 N.W.2d at 268, remand to allow the trial court to entertain a motion to amend the complaint could also be appropriate.

interpretation of the GCV formula—even the three times overrides measure for which Peters argued at trial—would yield damages that high. However, at trial Peters requested damages of $522,000—three times his overrides of $114,000, plus 6 percent interest. The award was thus within the range established by Peters' asserted GCV formula.

Mutual Benefit further argues that even if damages are not limited to those provided by the formula, no evidence supports the award because Mutual Benefit did not promise it would force an incoming agent to pay more than GCV, and an incoming agent would have no incentive to do so, because the agency could be terminated. This argument is essentially a factual argument on the terms of the agreement. Mutual Benefit represented that no incoming agent would be appointed unless the agent *agreed* to pay *at least* GCV. Peters testified that he understood that representation to mean that he could refuse to transfer the agency to someone who would pay only the minimum. If the jury accepted that testimony, it could also find that Mutual Benefit's right to terminate an agency contract was limited by Peters' right to negotiate a transfer price with the seller and Peters should have received in damages what he would have received in a negotiated sale. There was evidence on the profit-producing capability of the agency and testimony on factors to consider in determining its value. Wesley Fitzsimmons, regional director of agencies for Mutual Benefit from 1976 to 1979, testified that the value of the agency would be based on factors including its commission base, persistency and the existence of a strong group department, all of which indicate its future income-producing potential. Based on the agency's overrides of $114,000 in 1977, Fitzsimmons estimated its 1978 value between $300,000 and $400,000.

 The trial court has broad discretion in determining whether to grant a new trial for excessive damages. *Cardinal Consulting Co.*, 297 N.W.2d at 269.

The trial court in this case expressly found that an award of $365,000 for a business generating $114,000 in profits was fully supported by the evidence and was not excessive. That finding was not a clear abuse of discretion.

**VI**

 Finally, Mutual Benefit argues that evidentiary errors require a new trial. In particular, Mutual Benefit argues that the exclusion of a March 1979 letter described as the "definitive statement" of the GCV program was prejudicial and an abuse of discretion. The letter, written after Peters was terminated, would have been of doubtful relevance to the existence or terms of a prior contract. In any event, the exclusion was not prejudicial—testimony on the letter's contents was permitted, and Mutual Benefit in fact based its damages argument on the GCV program as defined in the letter.

 As to Mutual Benefit's other evidentiary objections, evidence relating to the circumstances of Peters' termination was relevant to his ability to negotiate a transfer price for the agency. While the evidence was prejudicial to Mutual Benefit, it was not unfairly prejudicial, and the trial court did not abuse its discretion in determining that its probative value outweighed its prejudicial effect. Similarly, evidence relating to the finances of the agency under Peters' successor was relevant to its ongoing value, and Mutual Benefit does not assert any prejudice resulting from that admission.

 The testimony of Don Schoeller on general evaluation practices was limited to his observation that commissions paid to external brokers and group commissions are customarily considered in evaluating life insurance general agencies, because they are profit sources. Assuming that the terms of the contract were as Peters testified, this evidence was relevant to the amount he could have received in a negotiated transfer. While the evidence would

have invited the jury to determine damages on some basis other than GCV, such an invitation was not prejudicial once the terms of Peters' GCV contract with Mutual Benefit had been litigated.

### DECISION

Affirmed.